[Argued Nov. 21, 1892, decided Jan. 9, and rehearing denied March 2, 1893.]

## HORACE CLINE *v.* J. C. GOODALE.

[S. C. 31 Pac. Rep. 956.]

CONTRACT — ALTERATION.— A wilful and material alteration of a contract, made by one of the parties without the consent or authority of the other, and after its execution, destroys the whole contract.

Lane County: MARTIN L. PIPES, Judge.

Defendant appeals.   Reversed.

This was a suit to cancel a contract on account of the alleged false and fraudulent representations of the defendant made with reference to the character of the property which was the subject thereof, to recover $3,800 paid thereon, with interest, and $500 for labor performed by plaintiff while carrying out its terms.   The defendant was the owner of a steam shingle mill, and also of a sawmill, at Coburg, Oregon, the latter being operated by water power that was furnished by a natural race from the McKenzie River.   A dam about two hundred feet long, with a wasteway in the center about fifty feet in length, over which the surplus water flowed, was built across this race.   This dam raised the water in the race and also in a lagoon that emptied into it above the dam, and formed a convenient pond for storing and holding sawlogs.   A headgate was placed in the dam that regulated the supply of water for the millpond and sawmill.   On March 10, 1891, the parties entered into a contract whereby the defendant agreed to sell to the plaintiff the saw and shingle mills, together with all his rights of milling and other privileges at that place, in consideration of $20,000, of which sum $4,000 was to be paid upon the execution of the contract, $6,000 on or before eight months, and the remainder on or before three years, with interest on the deferred payments.   All the lumber at the yard was included in the contract at $7 per thousand for common, and $15 per thousand for all of a better grade.   At the time the contract was prepared for execution no measure-

ment of the lumber had been made, and it was agreed that blank spaces should be left therein, and that when the amounts of the different grades had been ascertained and agreed upon they should be entered in these blank spaces. The defendant was to keep possession of all the property till the lumber and other material had been paid for, and also till $10,000 had been paid on account of the purchase price of the mill. On the day the contract was executed the plaintiff paid $2,000 and on May 1, 1891, he paid $1,800 more to be applied on the contract.

The plaintiff and one Henry Blum, selected by the defendant for that purpose, on March 11th commenced to make an inventory of the lumber in the yard, and, after working at it for two days, the plaintiff reported to defendant the amounts as follows: Common, 528,600 feet, and of a better grade, 134,536 feet. The defendant, after the plaintiff had made an inventory of the lumber, made another, and reported to his attorney, A. E. Gallagher, who had the contract in his possession, the amounts to be as follows: Common, 566,000 feet, and of a better grade, 203,000 feet; and Mr. Gallagher, at the request of defendant, placed these amounts in the contract as had been agreed upon by the parties.

The defendant had been permitting the sawdust from the mill to fall into the race and thus flow into the river. About May 1, 1891, it became necessary, in consequence of the statute of that year prohibiting persons from putting sawdust into streams, to provide other means for its disposal. To secure this, the plaintiff and defendant agreed to attach to the mill two sawdust carriers and one blower for planer shavings, to remove the dust and shavings to a place where they could not reach the river. This machinery proved to be quite a draft upon the power of the mill, and from the time it was attached there was a decrease in the daily amount of lumber manufactured. On May 7, 1891, one J. J. Thomas, whose land adjoined the race, commenced an action against defendant for $1,800 damages caused by the dam backing

the water upon his land, and to abate it as a nuisance; and this defendant on June 3, 1891, entered into a contract with said Thomas whereby he agreed to lower the water in the race and lagoon five inches, and to keep it at that stage, and thereupon that action was dismissed. In pursuance of that agreement, a short time thereafter the defendant lowered the wasteway of the dam. After the dam had been lowered, the defendant placed boards upon the top to supply the place of the timber taken orf in order to maintain the same head of water that the dam had furnished. The water in the river was unusually low that season, and on July 9th, a drive of logs became jammed in the race at its source, which continued there till some time in September, and thus prevented much of the water from flowing into it. The water in the river continued so low that the defendant was obliged to take the engine from the shingle-mill and attach it to the sawmill, to furnish sufficient power to manufacture lumber.

The plaintiff commenced this suit on October 26, 1891, and alleges that before purchasing the property he examined the same, and that it was of great value on account of its water power and boomage, and its adaptability for manufacturing purposes, and the maintenance of the dam at its then height was necessary to give the race, pond, boomage, and water power any value at all; that plaintiff informed defendant that he desired to purchase the property on account of its value for such purposes, and inquired of the defendant the capacity of the mill and concerning his right to maintain the dam as it then was, and the defendant then informed him that the mill had a cutting capacity of 22,000 feet per day, and that he had a right to maintain the dam and the water in the race as it then was, and that he would grant such right to him; and he also represented that parties owning land along said race could not interfere with or prevent him from maintaining the dam and water as it then was, and that if they could they would not so interfere with or prevent him, and that his right to the same was perfect;

that plaintiff was a stranger in the state, and being un-
acquainted with the parties owning land along the race,
relied upon the representations of the defendant, and be-
lieving them to be true, he entered into the agreement
and paid $3,800 thereon; that each and all of the repre-
sentations were false and fraudulent, and were then
known to be false and fraudulent by defendant, and were
made for the purpose of inducing plaintiff to enter into
the agreement.    Then he alleges the facts hereinbefore
stated.  The issues were completed and the cause referred
for the purpose of taking the testimony, and upon the
report of the referee the court decreed a cancellation of
the contract, a recovery of the money paid thereon, with
interest from the date of payment, and $500 for plaintiff's
services, from which decree defendant appeals.

*Lawrence Flinn,* and *A. E. Gallagher,* for Appellant.

*George A. Dorris,* and *L. Bilyeu,* for Respondent.

MOORE, J. (after stating the facts).—A general sum-
mary of the evidence taken shows the following:   The
testimony of the plaintiff tended to show that he asked
defendant before the contract was executed about his
water rights at the mill, and that defendant told him he
had the right and could maintain the dam as he wished;
that it could be raised higher if necessary; that the dam,
race, and lagoon had been used for that purpose for
more than twenty years, and that such use gave a right
to continue the same; that he went to the property with
defendant's agent for the purpose of examining the same
with a view of buying, and defendant requested him to
say nothing of his intended purchase, and that in con-
sequence of such request he made no inquiry of any
one at Coburg or elsewhere in relation to defendant's
water rights and privileges at the mill; that defendant
was not present when he made the examination of the
property, and that he did not again look at it till the
contract had been executed; that at that time the water

was pouring over the wasteway of the dam in a volume fifty feet wide and three feet deep; that he told defendant that he considered the mill of but little value, but that it was an excellent water power; that he understood from the defendant that he had an indefeasible right to maintain the dam and water privileges; that the defendant represented that the mill would cut from twenty thousand to twenty-two thousand feet of lumber per day, and that he had cleared ten thousand dollars a year out of it; that defendant had lowered the dam about thirty-four inches, and that from June 1st to September 20th he failed to restore it as it was at the time he contracted to buy the property; that about ten feet above the timber at the foot of the dam the brush and gravel stood from ten to twelve inches higher than the timbers of the dam where the water fell over, and that defendant first removed this brush and gravel, and then, finding that it did not lower the dam sufficiently, he cut out two ten-inch timbers, placed one on top of the other with a space of about three inches between them; that plaintiff told defendant at the time the dam was lowered that he objected to such lowering, and that defendant promised and agreed to put the dam back as it had been; that the effect of lowering the dam has been to render the property nearly worthless; that the power of the sawmill has been cut down one-half, so that it will not now cut more than twelve thousand feet per day, and in consequence the mill will not now pay running expenses; that by lowering the water it has decreased the boomage facilities so that it requires four extra men to get the logs to the mill.

The testimony of the plaintiff in relation to the statements of the defendant that he intended to replace the dam, is corroborated by the testimony of George W. Murch, who, at the request of defendant, tried to purchase five or seven acres of land from J. J. Thomas; and that the defendant told Mr. Murch if he could not get better power he would be obliged to abandon his mill property. Mr. Thomas testified that Mr. Murch and Mr.

Delaney, at the request of defendant, tried to purchase this land from him for defendant.   T. H. Blum testified that the dam has been lowered from one and one-half to two feet; that he has seen the dam since it was lowered, but he could not say exactly how much it had been cut down.   S. H. Thomas testified for plaintiff that he thought the dam had been cut down about eight inches; that he requested the defendant before he ever heard of the plaintiff, to lower the dam, and that the defendant promised to do so, if he had to use steam power.   F. A. Getchell, another witness for plaintiff, testified that he should judge that the dam was about two feet lower than it was in May; and then again, in almost the same breath, he says the dam has been lowered a good three feet since May, that the power in consequence has been cut down one-half, and that the mill had to be closed down in order to get logs to it.

The defendant testified that prior to the time the contract was made, he told the plaintiff the dam was about six inches higher than he had a right to maintain it, and that if the Thomases, who had been complaining, insisted upon it, the dam must come down about that much; that on two occasions prior to the execution of the contract, he told the plaintiff that the dam was about five or six inches higher than he had a right to maintain it; that the dam was lowered just six inches, and no more, by taking off a timber six by eight inches lying down flatways; that some brush and gravel had been removed from above the foot of the dam, but that this gravel and brush was not as high as the dam; that after this timber had been taken off he had placed boards on the dam, which retained the same amount of water it had originally held; that there were no ten by ten-inch timbers in the dam in March, at the time the contract was made; that the dam could not be lowered three feet from what it was at that time, for the reason that the dam was not that high in March. The defendant's testimony in relation to the statements made to plaintiff about lowering the dam, is corroborated

by the testimony of the defendant's wife, who testified that she was present at a meeting of the plaintiff and defendant at their home in Eugene, and heard her husband tell plaintiff that the dam was higher than he had a right to maintain it; that the Thomases were objecting to the height of the dam, and that he might be obliged to lower it; that E. J. Frazier was present at the time, but at that moment he was playing the piano. Mr. Frazier, in his testimony, denies that anything was said at that time about the dam, but he admits that he was playing the piano.

The testimony of the plaintiff is contradicted by that of J. J. Phipps, who says that he measured the depth of water on the gravel above the timbers of the dam and also measured the depth of the water on the timbers, and that the water was deeper on the gravel than on the timbers; that the gravel and brush could not be kept higher than the timber in such a current of water as flowed over the dam, and that taking off the brush and gravel did not lower the dam nor the water; that the timber taken off was six by eight inches lying down flatways; that two pieces were taken off, one twelve feet and the other sixteen feet long, placed end to end, and pinned down on the dam; that in July or August, the water was so low in the river that it did not fill the pond, and that he walked across the gravel on the dam and that there was no water running over the gravel; that the boards placed on the top of the dam raised the water as high as the dam did before it was lowered. George Snyder, who had charge of the headgate in the dam for two years, testified that the low water was caused by logs getting jammed in the race and thus preventing the water from coming into it, and that there was not enough water to fill the millpond; that the sawdust carriers and blower take off one-fourth of the power, and that the dam was lowered six inches. R. W. Beeson, the log hauler at the mill, testified that logs were in the race and prevented the water from reaching the mill from July

9th to September, and that the dam was lowered six inches and then held all the water that came; that the boards placed on the dam raise the water as high as it did before the dam was lowered; and that the gravel would have to be lower than the timbers of the dam. W. M. Bogart testified that the timber was higher than the gravel in March. Fred Rich testified that the saw-dust carriers and blower have taken off one-half of the power; that one of the chains is about eighty feet and the other about one hundred and fifty feet, and that he found it difficult to move them with an iron bar. Wm. Delaney, whose land is affected by the back water from the dam, testified that it was lowered about six inches. P. J. Blackinston testified that in March the mill cut from sixteen thousand to twenty-two thousand feet per day, and that when the carriers and blower were attached it reduced the cutting capacity from what it had been to about from eleven thousand to sixteen thousand feet per day; that the engine attached to the mill now cut, with the same head of water as they had in March, about the same amount of lumber as formerly; that the river was lower last season than usual, and that the boards put on the dam raised the water as high as the original dam; that the dam was now high enough to hold a sufficient head of water; that the plaintiff was in favor of moving the engine from the shingle mill and attaching it to the water power. W. H. See testified that plaintiff desired the engine moved and attached to the mill. Peter Nettleton testified that plaintiff told him that it took half as much power to run the carriers and blower as it did to run the mill. The testimony for defendant appears conclusive that the dam was lowered not more than six inches, and when it is compared with that of the plaintiff, that it had been lowered about thirty-four inches, it is apparent that there was a mistake, and that the preponderance of the testimony in relation to the alleged misrepresentations is with the defendant.

The plaintiff contends that the insertion of the amount

of lumber in the contract by the defendant was a wilful and material change in his interest and for his use and benefit, and that this alteration vitiates the whole contract. "A wilful and material alteration of a written instrument, made by one of the parties to it, after execution and without authority or consent of the other party, defeats any rights he would otherwise have under it": 1 Am. & Eng. Enc. 502; Bishop, Con. § 746. Any alteration in the amount of the principal is material: Bishop, Con. § 508. To defeat a contract, the alteration must be material, made without authority or consent of the other party, and wilful. The change in this contract was material.

The testimony of the plaintiff shows that the defendant agreed to insert the amount•of lumber in the contract; that if they could not agree as to the amount, that they would agree upon some person who should ascertain the amount; that the defendant selected Mr. Blum to aid him in making the measurement; that he understood that the estimate made by Mr. Blum and himself was to be entered in the contract; that he reported the amount estimated; that defendant was not there at the time the estimate was made; that they kept a tally of the lumber estimated; and that defendant never told him that the amount had been entered different from the estimate made by them. H. T. Blum testified for plaintiff that they could not estimate the lumber carefully for the reason that it was piled irregularly; that he told defendant several piles of lumber had not been counted; that the amount not counted was in his judgment about 50,000 feet, including culls; that he showed defendant several piles of lumber that had not been counted; and that he was positive that at different times he told him of the piles that were not counted. George Snyder testified for defendant that there were about 6,000 feet of two by six-inch lumber near the blacksmith shop; about 5,000 feet and a lot of cedar near the house in the lower yard; about 6,000 feet near the planer; a pile between the office

and platform; about 25,000 feet of two by three-inch lumber; and a miscellaneous pile that had not been estimated. Besides, where the plaintiff had estimated lumber, it had been found that by measurement thereafter it contained about twice as much lumber as he had estimated.

P. J. Blackinston testified for defendant, that he had been foreman for defendant for three years, and that on January 1st he had made an inventory of the lumber in the yard, and found it to be four hundred and forty-four thousand and six hundred feet; and that in March, when plaintiff made the inventory, there was twice as much lumber on the yard as there was in January. He then gives a detailed statement of twelve piles of lumber that were not estimated by plaintiff, which he estimates at one hundred and fifty-three thousand feet. The defendant testified that plaintiff brought some figures to him at Eugene, and said that he had to go back East and did not have time to estimate all the lumber, and told him to keep an account of the amount not estimated and put it in the contract, and that he measured up one hundred and eighty-seven thousand feet not estimated by plaintiff. The defendant's wife testified that plaintiff told defendant in her presence that there were several piles of lumber that he had not counted, and requested defendant and Mr. Blackinston to keep an account and put it with the contract with his estimate.

From this testimony it would appear that there was quite an amount of lumber that had not been estimated by plaintiff, and that defendant had estimated the same and requested Mr. Gallagher to enter the amount in the contract. The plaintiff may not have intended that the amount so estimated by defendant should have been entered in the contract, but the defendant so understood him and made the entry, and it may have been without his authority or consent, but it certainly was not wilful. The plaintiff could not be bound in any manner by this entry, since there had never been an agreement as to the

amount, unless the request to estimate and put it in the contract was such an agreement. There seems to have been no agreement as to the amount of lumber on the yard at the time the contract was made, and the plaintiff could not be bound to pay for any more than he had estimated unless the defendant could show that more than that amount had been delivered to him. Some criticism seems to have been made against the action of Mr. Gallagher for entering the estimate of the defendant in the contract. He knew that the parties were to agree upon the amount of lumber, and that the amount when agreed upon was to be so entered in the contract. His action in the matter was certainly upright, and he was doing only what the parties had expected him to do. That the contract had been in his possession all the time, there can be but little doubt, and he had a perfect right to make the entry therein, knowing the agreement of the parties.

From the foregoing examination of the testimony, the decree of the court below must be reversed and the bill dismissed, leaving the parties to adjust the amount of lumber to be entered in the contract.